# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

RICHARD LEE FOSTER,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

No. C11-3063-MWB

**REPORT AND RECOMMENDATION**

---

### *Introduction*

The plaintiff, Richard Lee Foster, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* ("Act") and Supplemental Security Income ("SSI") pursuant to Title XVI of the Act. Foster contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, the undersigned recommends the decision be reversed and this case remanded for further proceedings.

### *Background*

Foster was born in 1957. AR 24. He completed his education through the tenth grade but left school in the eleventh grade because he was working and was behind on his credit hours. AR 25, 306, 357. He spent two or three years of grade school in special education due to reading difficulties. AR 26-27. He never completed his GED. AR 357. He received some training as a welder at Iowa Central Community

College but testified that he did not make it through the welding course because he had difficulties with math.   AR 27.

Foster has work history, with records dating back to 1994.   AR 144-45.   His work history includes interruptions during periods of incarceration that resulted from convictions for lascivious acts with a child and operating while impaired, along with a parole violation.   AR 305.   From 2004 to 2006, Foster worked at Hog Slat, Inc., as a maintenance mechanic.   AR 39, 144, 254.   He testified that he was trained to repair hydraulic pumps and that he learned by watching others do the work.   AR 39-40.

Foster was sent back to prison in 2006 for a parole violation.[1]   On February 6, 2008, he was admitted to Clarinda Regional Health Center for injuries arising from a blow to the head.   AR 256-57, 263, 264, 300.   He was discharged from the hospital the following day.   AR 256.   He was released from prison on December 17, 2008.   AR 357.

Foster applied for DIB on January 7, 2009, alleging disability beginning on December 31, 2007.   AR 107-13.   He applied for SSI on the same day, alleging the same onset date.   AR 104-06.   The Commissioner denied Foster's applications initially and again on reconsideration.   Consequently, Foster requested a hearing before an Administrative Law Judge ("ALJ").   AR 53-66.   On July 22, 2010, ALJ Jo Ann Draper held a hearing in which Foster and a vocational expert testified.   AR 18-48.   On September 22, 2010, the ALJ issued a decision finding Foster not disabled.   AR 9-17.

Foster sought review of this decision by the Appeals Council.   AR 5.   On October 7, 2011, the Appeals Council denied his request for review.   AR 1-3.   The

---

[1]There is some confusion in the record as to the year Foster was sent back to prison.   He sometimes reported the year as being 2007.   *See, e.g.,* AR 166.   However, records show he was back in custody in 2006.   AR 287-91, 299.   Foster has indicated that being sent back to prison was the reason he stopped working.   AR 166.

ALJ's decision thus became the final decision of the Commissioner. AR 1; *see also* 20 C.F.R. § 416.1481.

On October 17, 2011, Foster filed a complaint in this court seeking review of the Commissioner's decision. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

## Summary of Evidence

### A. Department of Corrections Health Services

Foster was examined several times while incarcerated between 2006 and 2008. AR 271-98. In September 2006 he was found to have full range of motion in his back and neck, along with full strength and full range of motion in his extremities. AR 287-88. He reported a history of arthritis but no other concerns. AR 289. At that time, no work restrictions were imposed. *Id.*

In October 2007, Foster complained of constipation, ulcers and neck pain resulting from a weightlifting injury. AR 238. He reported that Tylenol or naxopren helped with the pain. *Id.* He continued to have full range of motion in his neck, back and extremities. AR 281-82.

Foster was examined again on October 30, 2008. AR 274-80. The records from that examination indicate he was subject to work restrictions that included no lifting of over 50 pounds, no climbing and no repetitive use of his hands. AR 279. No reason is given for these restrictions, nor do the records indicate when they took effect. Foster again was found to have full range of motion in his neck, back and extremities. AR 274-75. During the examination, Foster complained of constipation and increased

frequency of urination. AR 276. However, the record indicates "no complaint" with regard to various other categories, including "musculoskeletal" and "psychiatric." *Id.*

An "offender exit status" report dated December 15, 2008, indicated that the restrictions in place on October 30, 2008 were still in effect. AR 293.

## B. *Clarinda Regional Medical Center*

Foster was admitted to Clarinda Regional Medical Center with a head injury on February 6, 2008, and discharged the following day. AR 256-57. He was found to have a 12 cm laceration of the scalp and reported a probable loss of consciousness. AR 257. Upon discharge, there were no signs of neurologic deterioration. AR 256. Foster was deemed to be stable, neurologically alert and oriented. *Id.* However, a radiologist reviewing CT images of Foster's spine noted moderate degenerative changes, especially at C4-C5, and suggested an MRI evaluation if Foster had persistent back pain. AR 263-65.

## C. *Consultative Examinations*

On February 23, 2009, Foster was evaluated by Dr. Joseph Latella, a family practice physician. AR 299-300. Foster reported that he was on Lipitor for hyperlipidemia and Tylenol for arthritis. AR 299. He told Dr. Latella that his disability was neck and hip pain. AR 300. He also reported headaches resulting from the blow to the head he had received one year earlier. *Id.* Foster told Dr. Latella he could take care of his own finances and was able to drive (although his license was under suspension at the time). AR 299. A neurological examination resulted in normal findings. AR 300. Dr. Latella observed "good flexion and extension of all extremities and . . . [no] sensory or motor defects in the body as a whole. *Id.* Foster's range of motion was normal in all regards and a straight leg raise test was negative. *Id.* Dr. Latella observed that Foster walked without any difficulty and had no gait disturbance. *Id.* Dr. Latella noted no

limitations or restrictions and concluded with the following impressions: "Chronic sinusitis by history" and "Pain in the left hip." *Id.*

On March 3, 2009, Foster was evaluated by Dan L. Rogers, Ph.D., a licensed psychologist. Foster reported to Dr. Rogers that he could shop for himself, make change, do housework and read simple passages. AR 306. He denied having the ability to manage a checking account and stated that he does not cook. *Id.*

Dr. Rogers conducted a mental status examination, which showed normal speech, logically connected thoughts and appropriate associations. AR 306. He found Foster to be cooperative and open with fair insight and judgment. *Id.* Dr. Rogers further found that Foster showed good attention and fair concentration. *Id.* He was able to remember personal information and recent facts and his immediate memory was good. *Id.* Dr. Rogers noted that Foster performed mental calculations, serial sevens and backwards spelling "as well as most people." *Id.* Foster showed no signs of hallucinations, delusions, obsessions or compulsions. *Id.* He denied having suicidal thoughts. *Id.*

Dr. Rogers administered the Wechsler Adult Intelligence Scale IV (WAIS-IV), which resulted in a verbal comprehension index of 83, a perceptual reasoning index of 75, a working memory index of 69, a processing speed index of 68 and a full-scale IQ of 70. AR 309. Dr. Rogers diagnosed Foster with a learning disability, dysthymic disorder and personality disorder. AR 308. He assigned Global Assessment of Functioning (GAF) score[2] of 60. *Id.*

Dr. Rogers found that Foster would have difficulty understanding and remembering instructions, procedures and locations. AR 307. Dr. Rogers also found

_____

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *Diagnostic & Statistical Manual of Mental Disorders* (4th ed.) (DSM–IV) at 32. GAF scores of 31–40 indicate "major" impairment in social, occupational, or school functioning; scores of 41–50 reflect "serious" impairment in these functional areas; scores of 51–60 indicate "moderate" impairment; scores of 61–70 indicate "mild" impairment.

that Foster had adequate pace and attention but could not carry out instructions. *Id.* Nor could he interact with supervisors, co-workers or the public for normal periods of time. *Id.* However, Dr. Rogers determined that Foster would be able to adjust to workplace changes with adequate supervision. *Id.*

### D. Berryhill Center for Mental Health

On June 25, 2009, Foster was evaluated by James B. Burr, M.S., on referral from Vocational Rehabilitation. He stated that he had worked in construction his entire life but that he had been unable to find a job and had not worked in the past three years. AR 355, 357. He reported that he had served five years in prison for incest but denied he was guilty and stated that he had been trying to clear his name. AR 355. He characterized himself as a loner and said he did not like being around people because he was known as a sex offender. *Id.* Foster told Mr. Burr he had health problems other than his learning disability, that he did not have a primary care physician and had never received psychiatric treatment. AR 355-56. Foster expressed interest in receiving therapy "to become more comfortable in going out in society again." AR 358-59.

Mr. Burr concluded that Foster had average intelligence and "a lot of capabilities when it comes to mechanics and construction." AR 358. He diagnosed Foster with social phobia and assigned a GAF of 43. AR 359.

On July 24, 2009, Foster began therapy with Melanie K. Porter, Psy. D. AR 360. He expressed anger at the residents of Wright County for believing him to be a sex offender. *Id.* He also noted that he had been arguing with his siblings about whether to put their mother in a nursing home. *Id.* He stated that he would like to have assistance to learn how to manage his anger so he did not take it out on his mother. *Id.*

Dr. Porter noted that Foster "talked nonstop" and seemed to require "very little feedback or support" from her while talking. *Id.* He spent a good deal of time

discussing his plan to prove his innocence, but the information he shared "oftentimes did not seem to add up or make logical sense." *Id.* At the conclusion of the initial session, Dr. Porter scheduled a second session three weeks later and noted the plan would be "to improve ability to cope with psychosocial and family stressors as evidenced by a reduction in problems with anger. *Id.*

Foster was evaluated by Monte J. Bernhagen, M.D., and Mike Corsberg, P.A., on July 30, 2009. AR 361-65. He was noted to be "excessively focused on how he has been treated unfairly and how he wants people to perceive him." AR 362. His intelligence was found to be average and his memory intact, but he was noted to have "some delusional thinking with regard to ghosts and conspiracies to have him put in prison." *Id.* He was diagnosed with major depressive disorder (chronic, mid) and social phobia, with bipolar II disorder that needed to be ruled out, delusional disorder that needed to be ruled out and personality disorder that needed to be ruled out. AR 363. He was prescribed Lithium and Seroquel. *Id.*

Foster had additional therapy sessions and evaluations at the Berryhill Center through the time of his hearing with the ALJ. AR 365-86. No significant changes to his mental health condition appear to have occurred during this period of time. *Id.* He did report in March 2010 that he had "worked for a neighbor within the last week and felt a great deal of pride in this accomplishment." AR 380. He further reported that "trying to obtain employment continues to be difficult" and expressed an opinion that it would be "pointless" to try to find full-time gainful employment "given his criminal record." *Id.*

In April 2010 Foster indicated a desire to obtain a part-time job but felt that it would be unlikely because he lacked transportation. AR 383. In May 2010, he told Dr. Porter that his attorney would be contacting her about his disability claim. AR 384. He asked if she would support his claim and she stated that "it was a difficult call given that I felt that for the most part the patient is able to work but at this point given his legal background, he

is having a great deal of difficulty finding someone that is willing to hire him." *Id.* Dr. Porter noted that Foster "seemed to agree with my interpretation of the difficulty he is having in regards to obtaining employment." *Id.*

As of June 10, 2010, Foster's diagnosis was major depression and bipolar II disorder. AR 386.

### E. *State Agency Medical Consultants*

On March 24, 2009, Dr. Dennis Weis evaluated the medical evidence, including the consultative examination performed by Dr. Latella, to determine whether Foster had a severe physical impairment. AR 312. Dr. Weis noted that despite Foster's complaints of pain, he only took over-the-counter non-steroidal anti-inflammatories and aspirin. He also referenced Dr. Latella's physical exam which revealed normal range of motion in his extremities and full motor strength in the upper and lower extremities. *Id.* Dr. Weis concluded that Foster did not have a severe physical impairment. *Id.*

Dr. Weis' analysis was affirmed as written by Dr. James Wilson on June 15, 2009, after he found there was no further treatment for Foster's physical impairments and there were no significant changes to his activities of daily living. AR 337.

On March 31, 2009, David Christiansen, Ph.D. performed a psychiatric review technique and Mental Residual Functional Capacity ("RFC") assessment. Dr. Christiansen based his assessment on Foster's medically determinable impairments of learning disorder (possible dementia), dysthymic disorder, personality disorder, and alcohol dependence in remission. AR 313-22. He concluded that based on these impairments, Foster exhibited mild limitation in his activities of daily living, moderate limitation in maintaining social function and concentration, persistence, or pace, and had no episodes of decompensation. AR 323. In his mental RFC assessment, Dr. Christiansen found Foster was moderately limited in his ability to understand and

remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with others without being distracted, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. However, he was not markedly limited in any category.  AR 327-28.

In the narrative portion of his assessment Dr. Christiansen analyzed Foster's daily activities and the results of the consultative examination on March 3, 2009.  He concluded that Foster would "likely have difficulty with understanding and remembering more complex instructions and procedures."  AR 329.  He noted, "There is no significant information to suggest a progressive dementia.  The history suggests he may have interactional problems with others in the work situation.  The allegation of memory problems is partially supported by behavioral and clinical evidence."  *Id.*

Dr. Christiansen's RFC assessment was affirmed as written by John Tedesco, Ph.D. on June 3, 2009 given that Foster had not indicated a change in his medical condition since then and no further treatment was noted in the record.  AR 336.

## F.    *Plaintiff's Testimony*

At the hearing, Foster testified that he lives with his mother, has a valid driver's license and drove himself to the hearing.  AR 25, 36.  He completed the tenth grade and has trouble with reading and writing.  *Id.*  He is also "terrible" at math, although he is "not too bad with adding and subtracting."  AR 25-26.  He was in special education for a couple of years during grade school.  AR 26-27.  After leaving high school he had some training in welding but did not complete the course due to difficulties with math. AR 27.

Foster testified that as of the date of the hearing, he was receiving treatment at

Community Health in Fort Dodge for aches and pains in his hip and back.  AR 28.  He had been on Celebrex to relieve pain caused by arthritis but was taken off that drug because of its interactions with another drug.  *Id.*  He described his pain as follows:

> Well, it runs, runs down the middle of my back all the way down my leg, and, and just like my leg goes to sleep when I set to long, the – or if I stand too much, and, and, it's just a, a nagging pain that, that shoots through, through, you know, to the hip, and when she would check in my back, want to crawl on the walls because it – she hit at a really sore spot, and she said I haven't been having them muscle spasms in my, in my back.  So, the muscles -- . . . – on the left side, and that's the trouble, that's why I've been having a lot of trouble with you know, with my hip and stuff . . . .

AR 29.  Foster was advised to use ice to relieve the pain but could not be placed on pain medicine because of interaction with other medications.  AR 29-30.

Foster testified that the pain in his hip and back affects his ability to walk.  AR 30.  He walks around the house but does not go outside for walks  *Id.*  He estimated that he could walk for about 30 minutes, if necessary.  *Id.*  He further testified that standing in one place for more than 10 or 15 minutes would cause pain, as would sitting for more than 10 minutes.  AR 30-31.

With regard to mental health treatment, Foster testified that he has been diagnosed with depression and bipolar disorder and has been prescribed Seroquel and Lithium.  AR 31-32.  He believes the drugs make him tired and that he has no energy.  AR 31.  He testified about having anger issues but believes that treatment and medication have improved this condition.  AR 32-33.  He still has anger outbursts that are triggered by "[s]tupid people."  AR 33.  He also testified about his social phobia, stating that he doesn't like to socialize with people or go out in public.  AR 32-33.  Foster also acknowledged being an alcoholic but testified that he has not consumed alcohol in the past five years.  AR 34.

Foster testified that he was in prison on his alleged onset date of December 31,

2007, and that he was not released until December 15, 2008.   AR 35.   While in prison he worked in the foodservice department, putting food trays on a cart at mealtimes and taking the cart to the appropriate unit.   *Id.*   This task took about one hour each day and Foster did it for just over a year.   AR 35-36.

With regard to his prior employment, Foster testified that while working for Hog Slat, Inc., he repaired hydraulic pumps and made sure the machines were operating correctly.   AR 39.   He learned by watching others do the work.   AR 39-40.   He said that this "took quite a while because it's not something that everyone can do."   AR 40. He felt like he was still learning during the two years he worked for the company.   *Id.*

In his work history report, Foster indicated that his job at Hog Slat, Inc., from 2004 to 2006 required him to work 12 hours per day, seven days a week, with 10 hours of walking and two hours of standing each day.   AR 181, 185.   He further reported that he sometimes lifted 100 pounds and frequently lifted 50 pounds or more.   AR 185. He stated that this job required him to use machines, tools or equipment and that it required technical knowledge or skill.   *Id.*   In the same report, Foster indicated that various other jobs he performed over the 15 years prior to his alleged onset date also required him to lift 50 pounds with some frequency.   AR 183, 184.

### G.    *The Vocational Expert*

Vanessa May testified at the hearing as a vocation expert.   AR 37-47.   The ALJ asked two questions about two hypothetical individuals.   First:

> Now, Miss May, could you please assume that we have a hypothetical individual and this hypothetical individual has the same vocational profile as Mr. Foster.   In other words, the same age, education, and past work experience.
>
> This first hypothetical individual is exertionally limited to the performance of no more than light work activity.   Specifically, lifting and carrying twenty pounds occasionally.   More frequently, lifting and

11

carrying up to ten pounds at a time.

> Standing and walking is limited to six hours a day, sitting six hours a day. This individual could only occasionally climb, balance, stoop, kneel, crouch, crawl, but could never climb ropes, ladders, or scaffolds. This individual should have only occasional exposure to extremes in temperatures such as, heat and cold. There should be no requirement in this job to read instructions or write reports, and this individual should have only occasional interaction with the public, co-workers, and supervisors.

> Now, could this hypothetical individual perform any of the work that's been performed within the last fifteen years?

Ms. May answered "no" to this question. AR 42-43. When asked if this hypothetical individual had acquired any skills that were transferrable to other light jobs, she indicated that two such jobs exist. One is "inspecting machine adjuster," which is semi-skilled with an SVP[3] of 4 and light. There are about 50 such jobs in Iowa and 50,000 nationally. AR 43. The other is "belt repairer," also semi-skilled with an SVP of 4 and light, and with approximately the same number of jobs. *Id.* The ALJ later asked if there were jobs available for this hypothetical person without transferrable skills. Ms. May testified that there would be a "wide-range of light work." AR 47.

The second hypothetical was the same as the first, except that the individual was "limited exertionally to only sedentary work, lifting and carrying no more than ten pounds at a time; standing and walking, two hours a day; sitting six hours." AR 43. The question was whether "this individual who has the same vocational profile as hypothetical individual number one, and has the same other limitations that hypothetical individual

---

[3] "SVP" refers to Specific Vocational Preparation, which is defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." An SVP of 4 equates to preparation exceeding three months up to and including six months. *See Dictionary of Occupational Titles,* Appendix C.

number one has, could this individual perform any work that's been performed within the last fifteen years?" The answer was "no." AR 43-44. The ALJ asked if this second individual "acquired any skills that are transferrable to other sedentary jobs?" Again the answer was "no." AR 44.

The ALJ then asked a series of additional questions that assumed the second hypothetical individual:

> had to be able to change postural positions approximately every ten to fifteen minutes. Most of the time from seating – from sitting to standing, or, or walking, but rising from a seated position, for approximately two to three minutes without leaving the work area, but every ten to fifteen minutes . . .

*Id*. Ms. May testified that this person would not be competitive for any sedentary, unskilled positions. AR 45.

The ALJ asked Ms. May to assume that the first hypothetical individual could walk for thirty minutes at a time and then would need to sit for ten or fifteen minutes before resuming a standing or walking position. She asked Ms. May if this additional limitation would affect the person's ability to perform jobs at the light level of exertion. Ms. May indicated that neither of the two jobs she had identified in response to the original, first hypothetical could be performed with these additional limitations. AR 45.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

(2) The claimant has not engaged in substantial gainful activity since December 31, 2007, the alleged onset date.

(3) The claimant has the following severe impairments: diabetes mellitus, learning disability, personality disorder, bipolar disorder II, depression and a history of substance abuse in remission.

13

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix I.

(5) After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform heavy work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can lift and carry 100 pounds occasionally and 50 pounds frequently. He can occasionally climb, balance, stoop, kneel, crouch and crawl. He cannot climb ropes, ladders or scaffolds, he occasionally [sic] tolerate exposure to extreme temperatures of heat and cold. He cannot be required to read instructions or write reports on the job. He can tolerate occasional interaction with the public, co workers and supervisors.

(6) The claimant is capable of performing past relevant work as a construction worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(7) The claimant has not been under a disability, as defined in the Social Security Act, December 31, 2007, through the date of this decision.

AR 11-16.

With regard to Foster's credibility, the ALJ found that his medically determinable impairments could be expected to cause the symptoms he alleges, but that his statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the ALJ's assessment of his RFC. AR 15. The ALJ based this finding on the lack of medical evidence supporting Foster's subjective reports. *Id.* For example, the ALJ noted that while Foster was put on various restrictions in prison (no lifting over fifty pounds, no climbing, etc.), nothing in the record explains the reasons for those restrictions. *Id.* The ALJ also noted that Dr. Latella, who conducted a consultative examination, did not note any limitations, found

that Foster has good flexion and extension of all his extremities, and found no sensory or motor defects in the body as a whole. *Id.*

As for Dr. Rogers, who conducted the mental consultative examination, the ALJ found his "extreme limitations" to be worthy of little weight because (a) Dr. Rogers saw Foster only once and (b) those limitations are inconsistent with Foster's own reports. In particular, while Dr. Rogers found that Foster could not interact with supervisors, co-workers and the public, the ALJ noted that Foster "reported that he always got along with his peers and others and interacted and had a good relationship with his family." AR 15. Due to this perceived inconsistency, the ALJ decided to accord "only minimal weight" to Dr. Rogers' opinion. *Id.*

The ALJ observed that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." AR 16. The ALJ concluded that her determination of Foster's RFC "is supported by the objective medical findings in evidence, the limited and conservative treatment that the claimant has received and the opinion of the State agency medical consultants." *Id.*

Finally, having determined Foster's RFC, the ALJ found that he is able to perform past relevant work as a construction worker. AR 16. Based on this finding, the ALJ concluded that Foster has not been under a disability from December 31, 2007, through the date of her decision. *Id.*

### Disability Determinations and the Burden of Proof

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20

C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107

S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a

claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court will affirm the Commissioner's decision "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence

and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's

decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

### *A.* *The RFC Determination*

As noted above, the ALJ found Foster's RFC to be as follows:

> [Foster] has the residual functional capacity to perform heavy work as defined in 20 CFR 404.1567(c) and 416.967(c)[4] except he can lift and carry 100 pounds occasionally and 50 pounds frequently. He can occasionally climb, balance, stoop, kneel, crouch and crawl. He cannot climb ropes, ladders or scaffolds, he occasionally [sic] tolerate exposure to extreme temperatures of heat and cold. He cannot be required to read instructions or write reports on the job. He can tolerate occasional interaction with the public, co workers and supervisors.

AR 13. The claimant's RFC is "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a)(1). "The ALJ must determine a claimant's RFC based on all of the relevant evidence." *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004). This includes "an individual's own description of [her] limitations." *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The claimant's RFC "is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001), and must be supported by "some medical evidence." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). The medical evidence should address the claimant's

---

[4] Presumably the ALJ meant to refer to 20 C.F.R. §§ 404.1567(d) and 416.967(d) as these are the correct subsections explaining the limitations of heavy work as the ALJ described them.

"ability to function in the workplace." *Lewis*, 353 F.3d at 646. At step four, the claimant has the burden to prove his RFC and the ALJ determines the RFC based on all relevant evidence. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004).

Foster challenges both the physical and mental components of the ALJ's RFC determination. With regard to his physical capacity, Foster alleges there are "no facts in this record that supports [sic] the conclusion that Mr. Foster is capable of heavy work" and there is "no evidence in the record that establishes that weight limitation." Plaintiff's Brief at 8, 12. The Commissioner points out, however, that Foster's own work history report supports the ALJ's determination. For example, Foster reported that his job at Hog Slat, Inc., from 2004 to 2006 required him to work 12 hours per day, seven days a week, with 10 hours of walking and two hours of standing each day. AR 181, 185. He further reported that he sometimes lifted 100 pounds and frequently lifted 50 pounds or more. AR 185. This description is consistent with an RFC of heavy work. 20 C.F.R. §§ 404.1567(d) and 416.967(d).

While Foster was placed on some physical restrictions while incarcerated, the record contains no information concerning the reason for, or expected duration of, the restrictions. In any event, Foster's evaluation by Dr. Latella took place after his incarceration ended and resulted in no findings that support Foster's claimed physical limitations. A neurological examination resulted in normal findings. AR 300. Dr. Latella observed "good flexion and extension of all extremities and . . . [no] sensory or motor defects in the body as a whole." Foster's range of motion was normal in all regards and a straight leg raise test was negative. *Id*. Dr. Latella noted that Foster walked without any difficulty and had no gait disturbance. *Id*. Foster's "extremities were all normal with reflexes 4/4 and no loss of muscle girth or strength." *Id*. Dr. Latella specified no limitations or restrictions and concluded with the following impressions: "Chronic sinusitis by history" and "Pain in the left hip." *Id*. Dr.

Latella's findings, when combined with Foster's own work history report, provide substantial evidence supporting the ALJ's determination of Foster's physical abilities.

In assessing Foster's RFC, the ALJ considered but rejected his allegations of disabling limitations as not being fully credible. AR 15-16. This finding consistent with the objective medical evidence. While an ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, the complaints may be discounted based on inconsistencies in the record as a whole. *See, e.g., Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) ("[A]n ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."); *see also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984).

In addition to Dr. Latella's findings, the ALJ's credibility decision is supported by (a) the infrequency with which Foster sought treatment for his physical impairments and (b) the fact that his pain was generally controlled with over-the-counter medication. AR 28, 299, 283-84, 289, 348. The ALJ was permitted to consider the fact that Foster rarely sought treatment for pain. 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v) (noting that one of the factors the Commissioner considers is the "treatment . . . you receive or have received for relief of your pain or other symptoms"). The ALJ was also permitted to consider "[t]he type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv). Both of these factors support the ALJ's finding that Foster's pain is not as debilitating as he contends.

The ALJ's credibility determination is supported by other evidence as well. Foster's therapist found that "for the most part plaintiff [was] able to work," but no one would hire him due to his criminal background. AR 384. Moreover, there is evidence that Foster himself did not view his impairments as disabling, as he sought work throughout his alleged period of disability. AR 366, 371. Foster considered starting a

business with a friend so that he could repair cars and also considered "doing a number of different odd jobs around the community for people who [were] willing to hire him." AR 368, 377.   He performed some work for a neighbor, which gave him "a great deal of pride."   AR 380.

The ALJ was permitted to discount Foster's claim of disabling pain and physical limitations based on inconsistencies in the record as a whole.   The same is true concerning the third-party function report submitted by Foster's mother.   The ALJ considered that report and provided valid reasons for discounting it.   The ALJ found that the third-party report, "like the claimant's [allegations], is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case" AR 14. In addition, Foster lives with his mother.   AR 25.   Thus, the ALJ noted that Foster's mother is not "a disinterested third party [witness]."   AR 14.   This is a valid basis for discounting the third-party report.   *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) ("Corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case.").

The ALJ considered the record as a whole and made permissible credibility determinations to resolve inconsistencies.   In light of Foster's own work history report and the lack of significant findings by Dr. Latella, substantial evidence supports the ALJ's conclusion that Foster has the RFC to perform the physical demands of his past relevant work as a construction worker.   *See, e.g., Zeiler v. Barnhart,* 384 F.3d 932, 936 (8th Cir. 2004) (upholding the ALJ's reliance on the claimant's own description of past work).

Foster also alleges the ALJ's determination of his RFC failed to properly account for his mental limitations.   Foster relies on the conclusions reached by Dr. Rogers, which suggest that limitations should be added "about understanding and remembering

instructions, procedures and locations; that he would be unreliable in carrying out instructions and that he would accept change only if there were sufficient support and supervision, keeping in mind that his ability to interact with supervisors and coworkers is impaired." Plaintiff's Brief at 8. As noted above, however, the ALJ decided to accord "only minimal weight" to Dr. Rogers' opinion because (a) Dr. Rogers saw Foster only once and (b) his suggested limitations are inconsistent with Foster's own reports. AR 15. Moreover, as the Commissioner notes, Dr. Rogers assigned Foster a GAF of 60, indicating only moderate impairment. AR 308.

The ALJ is not bound by the limitations suggested by a medical consultant if those limitations are not consistent with other evidence. *See, e.g., Goff*, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [a medical] opinion."). Here, the ALJ articulated sufficient reasons for discounting Dr. Rogers' opinion. Moreover, while the ALJ gave that opinion "only minimal weight," she nonetheless included some mental limitations in her RFC determination, finding Foster "cannot be required to read instructions or write reports on the job," and that he "can tolerate occasional interaction with the public, co workers and supervisors." AR 13.

The ALJ was not required to simply accept Foster's (or his mother's) descriptions of his limitations. Instead, it was the ALJ's duty to review all of the evidence in the record in assessing Foster's RFC. The court finds that the ALJ's determination of Foster's RFC is supportable under the substantial evidence standard.

**B.**     *Foster's Ability To Perform Past Relevant Work*

The Vocational Expert, Ms. May, determined that Foster had past relevant work as both a construction worker and a maintenance mechanic. AR 254. She described "construction worker" as a semi-skilled position with an SVP of 4 and "maintenance

mechanic" as a skilled position with an SVP of 7. Having determined Foster's RFC, the ALJ found that Foster was able to return to past relevant work as a construction worker but not as a maintenance mechanic. AR 16. The ALJ's entire analysis of this issue was as follows:

**6. The claimant is capable of performing past relevant work as a construction worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The claimant had past relevant work as a construction worker. A construction worker, according to the *Dictionary of Occupational Titles* is performed at a heavy physical demand and a semi-skilled level. The claimant indicated that his past relevant work performed at a heavy physical demand. Based on the residual functional capacity set forth above the claimant could perform his past relevant work as a construction worker. (Exhibit 17E)

*Id.* Foster contends that the ALJ erred in finding that he is able to perform the physical and mental demands of the construction worker position.

Foster first argues that he did not actually perform construction work in his prior positions. Instead, he states he was a laborer, not a construction worker. Plaintiff's Brief at 10. However, this contradicts Foster's Appendix 1, which is his summary of his employment record. Doc. No. 10 at 17. Appendix 1 lists Foster's past employers and "type of work" and indicates that Foster performed "construction" work for at least two employers. *Id.* Appendix 1 further shows Foster was employed by two other construction companies as a "laborer." *Id.* Moreover, the Vocational Expert found, based on her review of Foster's employment record, that his past employment fit the criteria of "construction worker" as defined in the Directory of Occupational Titles. AR 254. Substantial evidence supports the ALJ's finding that Foster had past relevant work as a construction worker.

In any event, the precise label applied to Foster's prior work is not dispositive. A claimant is not disabled if he or she "has the RFC to do either the specific work

previously done or the same type of work as it is generally performed in the national economy." *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(f), 416.920(f). Here, Foster's work history report indicated the job he performed before being sent to prison required that he sometimes lift 100 pounds or more, lift 50 pounds frequently, while standing and walking for 12 hours with no sitting. AR 184-85. He did not supervise or lead other workers and he did not complete reports or perform any other writing. AR 30, 184-85.

Foster points to nothing about the ALJ's RFC finding that is inconsistent with the physical demands of his past relevant work, regardless of how that work is labeled. Ms. May determined that prior work to be heavy, semi-skilled work with an SVP of 4. AR 254. The ALJ was entitled to rely on Ms. May's description of the demands of that work. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). Her description of the physical demands is not inconsistent with Foster's RFC. As such, it was not error for the ALJ to find that Foster is able to perform the physical demands of his past relevant work.

The same is not true, however, concerning the mental demands of Foster's past relevant work. Indeed, it does not appear that the ALJ undertook any analysis to determine whether the mental limitations she expressly recognized in describing Foster's RFC are consistent with the demands presented by the position of construction worker. The ALJ found Foster "cannot be required to read instructions or write reports on the job" and, further, that he "can tolerate occasional interaction with the public, co workers and supervisors." AR 13. It does not appear that the ALJ analyzed the impact of these mental and emotional limitations on Foster's ability to perform construction work.

As the Eighth Circuit has observed:

Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative

ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source.... In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

*Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (*quoting* S.S.R. No. 82-62, Soc. Sec. Rep. 809, 811-12 (West 1983)). Thus, to determine if Foster is able to meet the mental demands of construction work, the ALJ was required to "obtain a precise description" of the duties of that position and compare those duties to Foster's limitations. This would include, among other things, information as to the necessity and frequency of interaction with co-workers, members of the public and/or supervisors. Because Foster's RFC permits only "occasional" interaction, he would not have the RFC to perform construction work if the position requires regular or frequent interaction.

There is nothing in the record to indicate the ALJ examined this issue. In finding that Foster has the RFC to perform construction work, she cited the *Dictionary of Occupational Titles* and Exhibit 17E, which is Ms. May's report. AR 16, 254. Ms. May's report concludes Foster's past relevant work as a construction worker falls within job code 869.664-014. AR 254. For that job code, the *Dictionary of Occupational Titles* states: "Work is <u>usually</u> performed with other workers." *See Dictionary of Occupational Titles* at 869.664-104 [emphasis added]. In other words, the only authority referenced by the ALJ (via her citation to Ms. May's report) expressly indicates that construction work is "usually" performed with other workers. This at least raises an issue as to whether Foster, who can tolerate only "occasional" interaction with others, has the RFC to meet the mental and emotional demands of construction work.

The ALJ failed to develop the record concerning this issue. Having expressly determined that Foster's ability to interact with others is limited, she had a duty to obtain "detailed information" about the construction worker position to determine if Foster's mental impairment is compatible with the performance of that work. Other than relying on the *Dictionary of Occupational Titles* (which, if anything, does not support her finding), the ALJ did not adequately explore this important question. The court finds there is not substantial evidence in the record supporting the ALJ's finding that Foster's RFC, as determined by the ALJ, is compatible with his past relevant work as a construction worker. Accordingly, the undersigned recommends that the Commissioner's decision be reversed and this case remanded for the ALJ to develop the record and make specific findings as to whether Foster has the RFC to meet the mental and emotional demands of his past relevant work as a construction worker.

In addition, because there is a reference to post-incarceration vocational rehabilitation in a medical record, Foster contends the ALJ should have developed the record regarding his vocational rehabilitation. Plaintiff's Brief at 11. He points out that vocational rehabilitation can be "an important criteria to the disability process." *Id.* (*citing* 20 C.F.R. § 404.468). While Foster's argument on this point is not exactly a model of clarity, the court does agree that the record should be developed further concerning Foster's participation in vocational rehabilitation after being released from prison. Accordingly, in light of the recommendation that this case be remanded for the ALJ to consider the mental and emotional demands of the construction worker position, it is further recommended that, on remand, the ALJ should develop the record and make specific findings concerning Foster's post-incarceration vocational rehabilitation efforts.

## C.    Listing 12.05C

Foster contends the ALJ erred at step three by failing to consider whether his IQ was medically equivalent to Listing 12.05C. Plaintiff's Brief at 11. The ALJ expressly found that Foster "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." AR 12. The ALJ then expressly addressed Listings 12.02 (organic mental disorder) and 12.04 (affective disorder), but not Listing 12.05C. *Id.* That Listing provides as follows:

> 12.05    *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. To establish his impairment meets or medically equals the Listing, Foster must demonstrate the symptomatology indicated in both the introductory material to Listing 12.05 and subsection C. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) ("This court agrees with the Commissioner that the requirements in the introductory paragraph [of Listing 12.05C] are mandatory.").

There is no dispute that Foster meets or equals two of the three criteria under Listing 12.05C, as (a) he has a full scale IQ of 70 and (b) the ALJ found he has other impairments that result in significant work-related limitations. AR 11, 309. Moreover, there is evidence that arguably supports a finding that Foster meets the third criteria, *i.e.,* that he has "significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental period."
*See, e.g.,* AR 26-27 (Foster needed special education as a child) and AR 173-180, 192-99 and 220-227 (function reports). For these reasons, and in light of the fact that the court is recommending remand on other issues, the ALJ should, on remand, conduct an analysis of Listing 12.05C and make specific findings concerning that Listing.

## *Recommendation*

For the reasons discussed above, the court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole. Accordingly, IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision be **reversed**, this case be **remanded** for further proceedings consistent with this report, and judgment be entered in favor of Foster and against the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA